IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| GERALD ROSENBERG | : | |
| | : | Case No. 18-cv-1111 |
| Plaintiff, | : | |
| | : | CHIEF JUDGE ALGENON L. MARBLEY |
| v. | : | |
| | : | Magistrate Judge Deavers |
| FAIRFIELD MEDICAL CENTER, | : | |
| | : | |
| Defendant, Third-Party Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE OHIO STATE UNIVERSITY MEDICAL CENTER, | : | |
| | : | |
| Third-Party Defendant. | : | |

**OPINION AND ORDER**

**I.      INTRODUCTION**

This matter comes before the Court on cross-motions for summary judgment from Plaintiff Gerald M. Rosenberg and Defendant Fairfield Medical Center ("Fairfield"; "FMC"). Defendant moves for summary judgment on its Third-Party Complaint for a declaratory judgment that Dr. Rosenberg was solely an employee Third-Party Defendant Ohio State University and on Dr. Rosenberg's disability-discrimination claims against Fairfield. (ECF No. 40). Plaintiff moves for partial summary judgment on Fairfield's liability for disability discrimination. (ECF No. 47). For the reasons set forth below, this Court **DENIES** Defendant's Motion for Summary Judgment. (ECF No. 40). It also **DENIES** Plaintiff's Motion for Partial Summary Judgment. (ECF No. 47).

**II.      BACKGROUND**

On September 25, 2018, Plaintiff Gerald M. Rosenberg, M.D., an orthopedic surgeon, filed the instant action against Fairfield Medical Center, alleging disability discrimination pursuant to

1

the Americans with Disabilities Act ("ADA"), 42 § U.S.C. 12101, *et seq*., and R.C. 4112. (ECF No. 48 at 5). Ohio State University Medical Center hired Dr. Rosenberg on January 16, 2017 and, soon thereafter, assigned him to work as a physician at Defendant Fairfield Medical Center. Dr. Rosenberg alleges that FMC and Ohio State employed him jointly, thus subjecting FMC to liability under the federal discrimination statute. Fairfield denies it jointly employed Dr. Rosenberg. (ECF No. 6, ¶ 9).

### A. Dr. Rosenberg's 2012 Injury and Re-Entry into Practice

In 2012, while working at Maine Coast Memorial Hospital, Dr. Rosenberg suffered a serious injury. (ECF No. 48 at 7). A heavy box filled with IV fluids or other materials came loose and struck him on the head and neck, causing him to suffer a stroke. (*Id.*). Following the stroke, Dr. Rosenberg required extensive rehabilitation. (*Id.* at 8). Eventually, his medical condition stabilized, though he continued to have longer-term issues with memory and attention. (*Id.*). In 2013, Dr. Rosenberg began practicing surgery at the United States Department of Veterans Affairs in Columbus, Ohio, representing his "re-entry into surgery following [the] stroke." (ECF No. 48 at 8). Dr. Rosenberg practiced at the VA successfully until 2016.

On August 17, 2016, Dr. Rosenberg emailed Dr. Andrew Glassman, the Ohio State University's Department Chair of Orthopedics, to inquire about open positions. (ECF No. 40 at 10). Dr. Glassman responded that "he was negotiating . . . with [Defendant] Fairfield" to provide physicians for Fairfield's orthopedic practice. (ECF No. 48 at 9).

### B. The Coverage Agreement Between Ohio State and Fairfield

Fairfield Medical Center is a community hospital in Lancaster, Ohio. After a group of independent orthopedic surgeons who had been practicing at Fairfield decided to build their own surgery center, Fairfield reached out to OSU to replace to lost volume of physicians. (*See* ECF No.

2

48 at 9 ("[A] lot of enthusiasm around . . . the ability for OSU to be here to help us as a partner to rebuild the practice.")). On November 21, 2016, Fairfield and OSU memorialized this partnership in the Orthopedic Coverage Agreement. The Coverage Agreement provided, in part,

> [Fairfield] owns and operates a community hospital and provides needed health services, including orthopedic services to the community and constituencies it serves. OSU employs physicians . . . [Fairfield] desires to engage OSU to ensure orthopedic coverage . . . .
>
> OSU acknowledges that all final decisions as to funds, staffing, operations, budgets and other administrative matters at hospital shall be within the sole authority of [Fairfield] . . . .
>
> OSU and [Fairfield] are both independent contractors, and nothing herein shall be construed to create a joint venture, partnership, or similar relationship between them or between [Fairfield] and any physician. No employee of a Party shall be considered to be an employee of the other Party, nor shall any employee of a Party be entitled to receive any employment-related benefits from the other Party . . . .

(Coverage Agreement Recital at 2, §§ 1(a), 13(e)).

### C.  Dr. Rosenberg's Assignment to Fairfield

On January 16, 2017, Ohio State formally hired Plaintiff Rosenberg. The parties dispute the purpose of Dr. Rosenberg's hiring. Fairfield argues that Dr. Rosenberg's assignment to FMC was an initial assignment, whereas Dr. Rosenberg argues that the "sole purpose" of the job would be "providing medical orthopedic care at Fairfield Hospital," (ECF No. 48 at 12). Dr. Rosenberg entered into an employment agreement with OSU, detailing the terms of and conditions of the professional relationship. Fairfield was not a party to this contract.

Before beginning at Fairfield, Dr. Rosenberg met with Fairfield personnel, a meeting that Dr. Rosenberg states evinces FMC's hiring power, but that FMC argues was no more than an "afternoon meet-and-greet." (ECF No. 53 at 15). In particular, Plaintiff recalls that he met with those at FMC because he needed to be integrated with "their . . . hospital[,] making sure that it was a good fit, [and] that Dr. Rosenberg's personality would fit." (ECF No. 48 at 13). Defendant

3

maintains that this meeting was simply an informal and perfunctory opportunity for Dr. Rosenberg to become acquainted with Fairfield. (*Id.*).

1. *Dr. Rosenberg's Work Performance*

During Dr. Rosenberg's first two days at FMC, he was required to attend "new employee or new hire or new service provider orientation," where he was joined by Fairfield workers providing direct medical services, as well as support staff such as housekeeping members. (ECF No. 48 at 13). Shortly into Dr. Rosenberg's assignment at Fairfield, some members of FMC staff grew concerned over Dr. Rosenberg's work performance. Fairfield and Ohio State both took their own, largely independent steps to investigate Dr. Rosenberg's competency, summarized below:

*(a) Fairfield's Investigation & May 4 Meeting*

In April 2017, Fairfield Nurse Manager ReGina Hines undertook an investigation into Dr. Rosenberg's work performance. The investigation culminated in a creation of a list of perceived issues with Dr. Rosenberg. The issues centered on three topics: (1) Dr. Rosenberg's issues with technology; (2) his work style; and (2) a moment in the operating room where he allegedly "froze" for about thirty seconds. This Court reviews these points in a bit more detail below.

First, Dr. Rosenberg had difficulties with Fairfield's technology from the beginning of his assignment at FMC. Dr. Rosenberg found "documenting in the electronic medical record . . . challenging." (ECF No. 48 at 15). Physician Assistant James Wright noticed that Dr. Rosenberg was "slow picking up on using the computer" but noted that a "lot of people just aren't good with computers." (*Id.*). On April 27, 2017, FMC Nurse Manager Hines asked Technology Aide Sarah Hutchinson how her work in training Dr. Rosenberg on the electronic medical records system was progressing. Ms. Hutchinson shared that Dr. Rosenberg was still struggling to use the database.

4

Second, another issue was related to Dr. Rosenberg's work style. FMC Nurse Manager Hines interviewed Nurse Steve Lester and Physician Assistant James Wright on April 27, 2017. Nurse Lester told Nurse Manager Hines that "Dr. Rosenberg had become a little elevated" when he could not find Nurse Lester for a procedure. (ECF No. 48 at 16). Other concerns that Ms. Hines documented included Dr. Rosenberg "overpromising" to patients, telling them that a surgery would be scheduled sooner than Fairfield could accommodate, or using ambiguous abbreviations on paperwork.

Third and finally, the only direct patient care issue Nurse Manager Hines documented was related to a shoulder arthroscopy on April 20, 2017. Dr. Rosenberg allegedly had a problem with inserting a medical device known as an anchor. He "froze" for a few moments, before he became frustrated with the manufacturer's representative, who was present in the operating room. (ECF No. 48 at 17). Nurse Wright summarized the incident to Nurse Manager Hines: "There was a case in the OR . . . Dr. Rosenberg had just kind of stared off for a bit and when one of the people in the OR, first assist or rep or someone tried to prompt him . . . he became elevated and had an outburst." At his deposition, Nurse Wright testified in greater detail:

> [W]e were standing behind the patient . . . And Dr. Rosenberg kind of stopped working. He just stepped back, crossed his hands over his chest and just stared at the screen where you would watch what is happening from the scope inside the shoulder. He just stood there staring at the screen. Seemed like a long time, I would guess roughly 30 seconds, but in an event like that[,] 30 seconds can seem like a long time. Everyone in the room was kind of looking around, looking at each other.

(ECF No. 48 at 17 (quoting Hines Dep. at 44:14–19)). The products representative "said something to the effect of, [']let's get back on the horse,['] . . . and Dr. Rosenberg snapped at him. He told him to shut up. [']I don't want to hear from you.['] He just stood there for a couple of seconds and then we got the surgery going again." (*Id.*). Nurse Dustin Karns recalled the incident as well, but

5

noted that the outburst was unlike Dr. Rosenberg who had a "pleasant attitude" and "was easy to talk to." (ECF No. 48 at 18 (quoting Karns Dep. At 11:19–21)).

Dr. Rosenberg testified that the allegations of him freezing were "out of context," and that he was not "staring blankly." (ECF No. 48 at 18). Rather, Dr. Rosenberg was looking at the monitor to ensure he did not lose sight of the anchor in the shoulder joint. Dr. Rosenberg contends that no one at Fairfield brought these alleged issues about him to his attention and characterizes the conclusions as "amazingly exaggerated" and "overblown." (ECF No. 48 at 15).

On May 4, 2017, Dr. Martha Buckley, FMC's Chief Medical Quality Officer, met with Dr. Rosenberg. This was the first time that Dr. Rosenberg discussed his cognitive difficulties caused by his stroke. Dr. Buckley told Plaintiff Rosenberg that Fairfield wanted to have a "proper checkout" to make sure that Dr. Rosenberg was okay; she is alleged to have said: "[I]f everything's all right, you'll be back to work here soon." (ECF No. 48 at 20 (quoting Rosenberg Dep. At 143:3-9)). Thus, the FMC Executive Committee decided that Dr. Rosenberg needed to submit to a "mental and physical" evaluation. (ECF No. 48 at 30). In the meantime, Fairfield asked Dr. Rosenberg to stop performing services at its facilities based on these various concerns about his work performance and competency. Dr. Rosenberg agreed to suspend service pending this evaluation. Fairfield also decided that OSU should perform the evaluation to assess Dr. Rosenberg's competency.

*(b) Ohio State's Investigation & Findings on Accommodations*

The first time that OSU had learned that Fairfield had issues with Dr. Rosenberg was when Dr. Buckley called Dr. Glassman on May 4, 2017. Dr. Buckley reported a "general concern was that sometimes [Dr. Rosenberg] appeared confused." (ECF No. 48 at 20). Dr. Buckley also told OSU that Dr. Rosenberg had issues with the computer system at FMC, and that "he required an

6

undue amount of assistance, almost continuous assistance" to navigate through the electronic medical record system. (ECF No. 48 at 21).

At FMC's behest, OSU arranged for Dr. Rosenberg to undergo a fitness-for-duty examination. Neuropsychologist Dr. Erica Dawson found "much more than mild" memory issues. (ECF No. 47 at 24). Neurologist Douglas Scharre also found Dr. Rosenberg suffered from "memory deficits" and "processing speed" issues. (*Id.*). Nevertheless, Dr. Scharre concluded that Dr. Rosenberg "could be competent in his job" as a surgeon with reasonable accommodations: Fairfield could provide proctoring, paperwork, and surgical assistance. (*Id.*). The recommendations included: "[C]onsistent medical assistant to be with [Dr. Rosenberg] in the outpatient setting," a daily paper list of patients to be seen," and a brief trial period with a peer-review component. (*Id.*). Fairfield emphasizes in its motion that OSU's investigation into Dr. Rosenberg's fitness-for-duty took place without its involvement. Fairfield was only informed of OSU's findings and recommendations to the extent that Dr. Glassman paraphrased them in a short email to Fairfield. Further, Fairfield alleges that OSU never discussed accommodations for Dr. Rosenberg with Fairfield because it was OSU's responsibility to accommodate any disability.

*(c) Re-assignment and Termination*

After reviewing Dr. Glassman's email paragraphing OSU's findings and taking into consideration its own staff's experience with Dr. Rosenberg, Fairfield decided that it did not want Dr. Rosenberg to return to Fairfield. Under the Coverage Agreement, Fairfield had the right to request that OSU replace Dr. Rosenberg with another physician. (ECF No. 53 at 10). Dr. Rosenberg argues that rather than consider the test results and diagnoses and purpose reasonable accommodations, Fairfield jumped to the conclusion that he was a threat to safety. (ECF No. 47 at 6). Nevertheless, FMC Chief Medical Officer Dr. Welsh informed Ohio State's Dr. Glassman that

7

FMC did not want to have Dr. Rosenberg back. Dr. Glassman recalled that: "[T]here was no negotiation . . . he was not welcome to come back." (ECF No. 48 at 36 (Glassman Dep. At 197:4-13). OSU then removed Dr. Rosenberg from Fairfield and gave him another clinical assignment in a non-surgical role at OSU, where he remained employed for over a year before OSU ultimately terminated the employment relationship. (ECF No. 53 at 13).

### III. STANDARD OF REVIEW

Both parties moved for summary judgment under Federal Rules of Civil Procedure 56. Summary judgment is proper if the movant shows "there is no genuine issue as to any material fact" and that they are "entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Orrand v. West End Land Development, Inc.*, No. C2-09-CV-0212, 2010 WL 1817333, at *1 (S.D. Ohio 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. But the non-moving party non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When ruling on a motion for summary judgment, the court may rely on the evidence called to its attention by the parties; the court is not required to sift through

the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

When confronted with cross-motions for summary judgment, the Court must review each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party. *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004). The mere filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate. *Id.*

### IV. LAW & ANALYSIS

Under the "joint-employer" theory, "an entity that is not the plaintiff's formal employer may be treated under these doctrines as if it were the employer for purposes of employment laws such as Title VII." *Nethery v. Quality Care Invs., L.P.*, 814 F. App'x 97, 102–03 (6th Cir. 2020) (citing *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 Fed. Appx 488, 491 (6th Cir. 2011)). The inquiry focuses on whether an entity "maintains sufficient control over some or all of the formal employees of another [entity] as to qualify as those employees' employer." *Sanford v*, 449 Fed. Appx at 491; *Swallows,* 128 F.3d at 993 n.4 (same). The Sixth Circuit has held that "[o]ne entity is the joint employer of another entity's formal employees, and thus liable under federal and state anti-discrimination laws, if the two 'share or co-determine those matters governing essential terms and conditions of employment.'" *Sanford,* 449 Fed. Appx. at 492 (citing *Carrier Corp. v. Nat. Labor Relations Bd.*, 768 F.2d 778, 781 (6th Cir. 1985)). Factors to consider when making this determination include the familiar trio of employment law, i.e., the ability to: (1) hire, fire, and discipline; (2) affect compensation and benefits; and (3) direct and supervise performance, along with other indicia of control. *Id.* (citing *Sanford v. Main Street Baptist Church Manor, Inc.,* 327 Fed. Appx. 587, 595 (6th Cir. 2009)).

9

### A. Hire, Fire, and Discipline

Defendant Fairfield Medical Center moves for summary judgment, contending that it did not have the ability to hire Dr. Rosenberg. The summary judgment record here includes sufficient evidence capable of supporting a reasonable finding that Fairfield had the power to hire, fire, or discipline Dr. Rosenberg. Four points, reviewed below, led the Court to this conclusion.

First, the parties quibble over the significance of Dr. Rosenberg's "afternoon meet-and-greet" at Fairfield. (*See* ECF No. 53 at 15). Fairfield contends the meeting was introductory; Dr. Rosenberg argues it was evaluative. (Id.; *see also* ECF No. 48 at 13). Even if the meeting were evaluative, Fairfield argues that its contractual right under the Coverage Agreement to deem Dr. Rosenberg acceptable for assignment at FMC is distinct from actual hiring authority.

That the right to approve an employee for on-site assignment does not equal hiring authority is well established in caselaw. *See, e.g.*, *Crumpley v. Associated Wholesale Grocers*, 2018 WL 1933743, at *32 (D. Kan. Apr. 24, 2018) ("[T]he right to reject an employee designated by a contractor does not equal the right to terminate the employee's employment with another company."). The afternoon-meet-and-greet appears to have been perfunctory and more akin to the introductory meeting the Western District of Texas reviewed in *Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, No. SA-18-CV-404-XR, 2020 WL 1248263, at *17 (W.D. Tex. Mar. 16, 2020), *aff'd sub nom. Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918 (5th Cir. 2021). In *Perry*, the court found that that informal meetings with hospital personnel were more of an introduction, not an assessment, and did not evince joint employment. *Id.* at *17 ("The purpose was to see if he would be compatible to work with the staff . . . ."). So too here. There is no evidence that the afternoon-meet-and-greet at Fairfield played a significant role in Dr. Rosenberg's hiring or that Fairfield's approval was required for Ohio State to hire Dr. Rosenberg. Absent evidence

10

that this afternoon meeting was evaluative and a necessary step for Dr. Rosenberg to be hired, this Court does not find it to be probative of Fairfield's hiring authority.

Second, the parties also disagree what the underlying reason was for Dr. Rosenberg's hire. The summary-judgment record suggests that providing care at Fairfield was the primary clinical reason for Dr. Rosenberg's OSU hire. This distinguishes the case from *Crumpley*, 2018 WL 1933743, at *1, relied on by Fairfield. In *Crumpley*, the plaintiff was hired as a security guard to-be-assigned to any number of locations. Conversely, Dr. Rosenberg's hire appears to have occurred with FMC's Lancaster's office in mind specifically. This counsels in favor of joint employment. But-for Ohio State's Coverage Agreement with Fairfield, the record suggests that Dr. Rosenberg would not have been hired at all. If true, then, given that the motivating purpose of Dr. Rosenberg's hiring was assignment to Fairfield, Fairfield may have retained some hiring authority—albeit in a down-stream manner from OSU's formal hiring process.

Third, pursuant to § 23 of Ohio State's Employment Agreement with Dr. Rosenberg, OSU retained the firing authority. Fairfield could "request" that Ohio State remove Dr. Rosenberg, at which point the university "may replace the Physician with another Physician." (ECF No. 54 at 20 (citing Coverage Agreement § 7(d))). Fairfield relies upon *Nethery v. Quality Care Invs., L.P.*, 814 F. App'x 97 (6th Cir. 2020) to argue it lacked hiring authority contractually, as well as in practice. This Court pauses to review the Sixth Circuit's decision in *Nethery*.

In *Nethery*, the Sixth Circuit reviewed plaintiff Thomila Nethery's case against Quality Care Investors. *Nethery*, 814 F. App'x at 98. Quality Care contracted with Reliant Management Group to provide services to its nursing home residents, and, in 2011, Reliant hired Nethery as a physical-therapist assistant at a Quality Care facility. Nethery reported to and was supervised by Reliant's onsite director of rehabilitation, Patrick Grubbs. In April 2016, several Reliant physical

11

therapists, including Nethery, complained to Reliant that Grubbs had engaged in inappropriate behavior. Reliant directed the Reliant-hired physical therapists not to discuss the sexual harassment allegations against Grubbs with Quality Care. Reliant investigated the allegations and soon removed Grubbs from the Quality Care facility. Shortly thereafter, Samantha Mullins, Quality Care's administrator, complained to Reliant that Nethery was not a good fit at its workplace. Following the performance evaluation, Reliant removed Nethery from the Lebanon Facility.

Nethery sued Quality Care for unlawful retaliation under Title VII, alleging that Mullins, upset over the termination of Grubbs, demanded that Reliant remove her. Nethery argued that Reliant had a practice of "removing employees at [Quality Care's] insistence." *Id.* at *103. But the Sixth Circuit found that there was insufficient evidence that Quality Care had the ability directly to fire Reliant employees. The record established that Reliant retained near complete control over Nethery's employment and was not a mere nonentity at the Quality Care's facility, prompting the Sixth Circuit to grant summary judgment for Quality Care. The Sixth Circuit explained: "It was Reliant [i.e., the formal employer] who removed [Plaintiff] Nethery from [Quality Care's] facility. Quality Care had no authority to do so." *Id.* at 104 n.2. Other caselaw confirms that the right to request removal does not equal firing power. *Perry*, 2020 WL 1248263, at *18 ("[T]he fact that [the hospital] exercised its contractual right to ask for Perry to be removed from the [pediatric intensive care department] does not make [the hospital] his joint employer.").

The case *sub judice* is different than *Nethery* (and *Perry*). And looking outside of the four corners of the Coverage Agreement presents quite a different story than the plain language suggests. It was Fairfield—not Ohio State—that suspended Dr. Rosenberg's assignment to FMC. It was Fairfield who ordered that Dr. Rosenberg submit himself to a cognitive fitness assessment. It was Dr. Welch, the Chief Medical Officer at FMC, who told Dr. Glassman of OSU that Fairfield

12

did not want to have Dr. Rosenberg return to FMC. These steps were taken without any prospective consultation with OSU. All of this strongly suggests Fairfield had termination authority. Accordingly, this Court finds that there is a fact issue of whether Fairfield retained authority to fire Dr. Rosenberg.

The fourth and final point belongs to disciplinary authority. OSU agreed that it would be involved in an ultimate decision on disciplinary issues. (ECF No. 40 at 11 ("[A]nything that needed to be investigated or certainly any disciplinary action would be taken by [Dr. Rosenberg].")). It is dubious whether Fairfield retained authority to discipline Dr. Rosenberg. And it does not appear that FMC ever formally disciplined Dr. Rosenberg. Standing alone, Fairfield's putative disciplinary authority does not suffice to render it a joint employer of Ohio State for Title VII purposes.

In summary, the record is sufficient to support a determination that Fairfield could hire or fire Dr. Rosenberg. This Court will also let the discipline claim continue, given that the hire, fire, and discipline analysis might rise and fall in tandem.

### B. Compensation and Benefits

Next, this Court finds that there is a genuine issue of material fact on whether Fairfield had the ability to affect compensation and benefits. The plain language of the Coverage Agreement favors Fairfield: Section 13(e) of the Coverage Agreement states that OSU physicians were not entitled to receive any employment-related benefits from Fairfield. (ECF No. 54 at 7). But it is not true, as Defendant would have this Court believe, that Dr. Rosenberg's salary had nothing to do with his assignment to FMC. Dr. Rosenberg states that he was instructed that he would earn his salary by exclusively "tak[ing] care of patients and do[ing] surgeries" at FMC. (Rosenberg Dep. at 50:24-51:1, 52:3-12, 58:20-23). Even more probative is Third-Party Defendant Ohio State's

clarification in Response to Defendant Fairfield's Motion for summary Judgment: "In fact, Dr. Rosenberg's salary was directly tied to his ability to provide services at FMC, and OSU reduced Dr. Rosenberg's salary after FMC banned him from practicing there because Dr. Rosenberg would not [have been] able to generate enough revenue to support his salary." (ECF No. 46 at 3). This establishes a genuine issue of material fact of the extent to which FMC could control or influence Dr. Rosenberg's income.

### C.  Direct and Supervise Performance & Other Indicia of Control

Finally, this Court turns to the catch-all category for the joint-employment analysis: other indicia of control. Counseling against a finding of a joint employment is that OSU provided insurance and benefits to Dr Rosenberg. Ohio State was responsible for ensuring that its physicians met numerous requirements for licensure, certification, and credentialing. (ECF No. 40 at 11). Dr. Glassman of Ohio State functioned as the "medical point person" for the OSU physicians. (ECF No. 40 at 13). And that Dr. Rosenberg had to obtain privileges to practice at Fairfield does not convert Fairfield into a joint employer with Ohio State, but just fulfills certain compliance obligations.

Counseling in favor of the joint-employer finding is that Dr. Rosenberg "ha[d] [no] place to practice at Ohio State," never performed surgery at OSU, nor did OSU give him admitting privileges to practice there. Dr. Rosenberg had no on-call or clinical duties at OSU. (ECF No. 48 at 12). Dr. Rosenberg's on-boarding required a two-day training that FMC conducted. Fairfield provided all the offices, equipment, and staff for OSU-hired physicians. (ECF No. 48 at 24). In addition, nearly all of Dr. Rosenberg's scheduling was influenced by Fairfield, and Fairfield would schedule whether Dr. Rosenberg would be operating or seeing patients without seeking input from him or anyone at OSU. Fairfield also had its own protocols and quality standards by which Dr.

14

Rosenberg had to abide. For example, FMC performed quality review assessment meetings without OSU's attendance. Fairfield marketed the arrangement with logos and names of both itself and OSU: "[N]ow you can win with Ohio State specialists right here in Lancaster." (ECF No. 48 at 11). FMC also distributed to the public other advertising materials, inviting them to "[m]eet our new Fairfield Healthcare Professionals orthopedic physicians," listing Dr. Rosenberg, among others. (ECF N. 48 at 11). An internal Fairfield newsletter said: "[P]lease welcome the following employees," again listing Dr. Rosenberg. (*Id.* at 30).

Dr. Glassman of Ohio State stated: "[F]or the most part, Ohio State was serving sort of as a passthrough." (ECF No. 48 at 29). Notably, it was Fairfield—not OSU—that initiated the fact-finding investigation into Dr. Rosenberg's work performance. Fairfield shared the results of the investigation with Ohio State and urged that OSU oversee a separate investigation. And OSU did so. In other words, because Fairfield undertook its own investigation, then Ohio State agreed to oversee Dr. Rosenberg's competency evaluation. This raises a clear issue of material fact on Fairfield's ability to control and dictate the terms of Dr. Rosenberg's employment.

On balance, this Court finds that there is a genuine issue of material fact on whether Fairfield could control the terms and conditions of Dr. Rosenberg's employment assignment to Fairfield. For these reasons, Fairfield is not entitled to summary judgment against Dr. Rosenberg's joint-employment claim.

### D. Plaintiff's Motion for Partial Summary Judgment

Dr. Rosenberg argues that he is entitled to partial summary judgment on whether he is disabled for purposes of the ADA and Fairfield's failure to accommodate. To make a prima facie case of disability discrimination under the ADA, plaintiff first must prove that Fairfield was his employer. *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997).

Plaintiff argues as follows: Dr. Rosenberg's disability has diminished his short-term memory, impaired his ability to learn new computer systems, and distorted his sense of direction in new environments. (ECF No. 47 at 6). Despite his disability, he completed without incident more than three years of performing surgery at a VA hospital before his stint at FMC. When FMC expressed its concern, he agreed to be examined for ongoing impairment of his ability to perform as a surgeon. The result of the fitness-for-duty examinations and review by an OSU Committee was that, with reasonable accommodations, Dr. Rosenberg could fully function at FMC. After being told about the results of the examinations and a Committee review, FMC refused even to discuss those reasonable accommodations. There were no adverse outcomes in any of the surgeries Dr. Rosenberg performed at FMC. Nevertheless, FMC decided he was a threat to patient safety, bad for publicity, and unable to get the hang of its recordkeeping. FMC never explored the feasibility of the proposed accommodations or whether they would have imposed an undue hardship.

Resolution of this failure-to-accommodate question is premature pending the fact-finder's evaluation of whether Fairfield was a joint employer with OSU. Defendant Fairfield has an obligation to accommodate Dr. Rosenberg only if it is a joint employer. Until that is determined, it cannot be decided whether FMC failed to accommodate.

### V. CONCLUSION

For the reasons set forth above, this Court **DENIES** Defendant's Motion for Summary Judgment and also **DENIES** Plaintiff's Motion for Partial Summary Judgment. (ECF Nos. 40, 47).

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: August 11, 2021**